GRIFFIN, J., delivered the opinion of the court in which SUTTON, J., joined. CLAY, J. (pp. 492-503); delivered a separate dissenting opinion.
OPINION
GRIFFIN, Circuit Judge.
Pretrial detainees must tolerate some invasion of them privacy in order to accommodate the important government interests necessary for the operation of the detention facility. For instance, detainees may be subjected to suspicionless strip searches as part of the jail’s intake process. See Florence v. Bd. of Chosen Freeholders of Cty. of Burlington, 566 U.S. 318, 328, 132 S.Ct. 1510, 182 L.Ed.2d 566 (2012). The issue we face is whether periodically conducting group strip searches when the number of jail inmates waiting to be processed makes individual searches imprudent constitutes a violation of clearly established Fourth Amendment law. Under the facts of this case, we answer that question “no” and therefore hold that the jail official who conducted the group searches, defendant Terri Graham, is entitled to qualified immunity. In addition, we affirm the district court’s grant of summary judgment in favor of defendants Wayne County and the Wayne County Sheriff on plaintiffs Monell claims and requests for injunctive and declaratory relief.
I.
In late 2012, plaintiff Amanda Sumpter spent a month in the Wayne County Jail in Detroit, Michigan.[1] During her incarcera *479 tion, Sumpter underwent four strip searches that she alleges violated her Fourth Amendment rights.
Three of the searches occurred in the jail’s Registry, where inmates are routinely strip searched when first arriving to jail or returning from a trip outside. Defendant Corporal Terri Graham conducted the three Registry searches of plaintiff. No male deputies were present for these searches. Each time, Graham escorted plaintiff into the Registry with as many as five other women. Although the door to the room had a window, it was covered with paper, preventing anyone outside the Registry from observing the searches. Inside, Graham instructed the inmates to undress, and if they were arriving for the first time, she collected their street clothes and personal effects. She then directed the inmates to perform a series of tasks, including shaking their hair, opening their mouths, lifting their breasts, and squatting and coughing, while Graham visually inspected for hidden contraband — an experience plaintiff described as “embarrassing” and “humiliating.” Afterwards, Graham provided the inmates with jail attire, and escorted the arriving inmates to see medical personnel while the returning inmates waited to be taken to their cellblock.
The fourth search occurred in plaintiff’s cellblock, where inmates are housed. After searching the cells for contraband, an unidentified female guard gathered the inmates in the common area, lined them up, and conducted a group strip search. According to plaintiff, the strip search took place in view of the guards’ central command post inside the cellblock, commonly called the “Bubble.” During this search, plaintiff saw and heard three male guards inside the Bubble. Although she could not identify their faces because the glass was tinted, she saw their silhouettes and believed they were facing the common area.
Two years later, in December 2014, plaintiff filed suit against Graham, Wayne County, and the Wayne County Sheriff, alleging that the searches violated her constitutional rights. Plaintiffs complaint alleged two Fourth Amendment claims: first, she complained that Graham’s three Registry searches were unreasonable because they were conducted in an unprofessional manner and in front of other inmates; second, she alleged that the group strip search in her ■ cellblock was unreasonable because male guards were able to watch from the Bubble. Plaintiff sought monetary, injunctive, and declaratory relief on behalf of herself and all other similarly situated female inmates at the Wayne County Jail.
Plaintiff also filed motions to certify the class and to preliminarily enjoin the group searches. Before the district court ruled on these motions, defendants filed a motion for partial summary judgment. First, Graham argued that she was entitled to qualified immunity on the Registry-searches claim. Relying on Graham’s affidavit and deposition testimony that she conducted group strip searches only when the volume of inmates waiting to be processed required it, defendant Graham argued that no case clearly established that her conduct constituted a Fourth Amendment violation. Second, defendants Wayne County and the Wayne County Sheriff moved for summary judgment on plaintiff’s cellblock-search claim on the grounds that plaintiff merely alleged an isolated incident without submitting any evidence showing it was the product of an official policy or custom. Finally, defendants argued that plaintiffs requests for injunctive and declaratory re *480 lief were moot because Sumpter did not reside at the jail at the time she sued.
The district court agreed with defendants on all three fronts. In the same order, it also denied without prejudice the pending motion for class certification, as well as plaintiffs motion to strike an errata sheet that defendants filed as part, of their summary judgment motion.[2] Following the entry of a final judgment, plaintiff appeals.
IL
We review ,a district court’s grant of summary judgment de novo, Keith v. Cty. of Oakland, 703 F.3d 918, 923 (6th Cir. 2013). Summary judgment is proper “if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.” Fed. R. Civ. P. 66(a). “To prevail, the nonmovant must show sufficient evidence to create a genuine issue of material fact,” which is to say, “[t]here must be evidence on which the jury could reasonably find for the [nonmovant].” Napier v. Madison Cty., Ky., 238 F.3d 739, 742 (6th Cir. 2001) (citation and internal quotation marks omitted)". “We consider all facts arid inferences drawn therefrom in the light'most favorable to the nonmov-ant.” City of Wyandotte v. Consol. Rail Corp., 262 F.3d 581, 585 (6th Cir. 2001).
III.
A.
The district court granted summary judgment in favor of Graham on the basis of qualified immunity. That doctrine shields governmental officials from monetary damages as long as “their actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known.” Chappell v. City of Cleveland, 585 F.3d 901, 907 (6th Cir. 2009). To determine whether a defendant is entitled to qualified immunity, we perform a two-part, inquiry, Pearson v. Callahan, 555 U.S. 223, 232, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009), which we may conduct in either order, id. at 236, 129 S.Ct. 808. We ask whether the facts alleged or shown “make out a violation of a constitutional, right” and “whether the right at issue was ‘clearly established’ ” at the time of the incident. Id. at 232, 129 S.Ct. 808 (quoting Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)). A plaintiff must satisfy both inquiries,in order to defeat the assertion of qualified immunity. Wesley v. Campbell, 779 F.3d 421, 428-29 (6th Cir. 2015).
B.
The Fourth Amendment governs plaintiffs claim against Graham. As in most Fourth Amendment contexts, the legal standard in this case requires us to balance the nature of the intrusion against the need for the particular search, though in, the corrections setting we afford deference in favor of correctional officials’ peno-logical expertise and interests. Florence v. Bd. of Chosen Freeholders of Cty. of Burlington, 566 U.S. 318, 328, 132 S.Ct. 1510, 182 L.Ed.2d 566 (2012) (“[C]ourts should ordinarily defer to their expert judgment in such matters.” (citation omitted)).
This deferential balancing test originates from Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), where the Court confronted for the first time the issue of strip searches in the corrections context. In Bell, the Court held *481 that a federal detention center’s blanket policy of conducting visual body cavity inspections of all detainees returning from a “contact visit” did not violate the Fourth Amendment. Id. at 558, 560, 99 S.Ct. 1861. Along with, its holding, the Court set forth “general principles” to.guide the analysis of searches conducted in the corrections setting. Id. at 545, 99 S.Ct. 1861.
The Court began by recognizing that pretrial detainees “do not forfeit all constitutional protections” > as a result of their confinement, id., but their rights are necessarily limited by “the legitimate goals and policies of the penal institution,” id. at 546, 99 S.Ct. 1861. Among the legitimate goals of a penal institution is “maintaining institutional security and preserving internal order and discipline,” matters that the Court emphasized were within the expertise of corrections officials. Id. “[T]he problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions,” id. at 547, 99 S.Ct. 1861, the Court said, acknowledging that a given corrections official will naturally “have a better grasp of his domain than the reviewing judge,” id. at 548, 99 S.Ct. 1861. Consequently, corrections officials “should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.” Id. at 547, 99 S.Ct. 1861. That is, unless there is “substantial evidence in the record to indicate that the officials haye exaggerated their response to these considerations!;.]” Id. at 548, 99 S.Ct. 1861.
The Supreme Court returned to these principles thirty years later when it revisited the issue of jail strip searches in Florence. There, the Court confronted whether the Fourth Amendment required jail officials to have reasonable suspicion before strip searching new detainees who were arrested for minor offenses and being committed to • the jail’s general population. Florence, 566 U.S. at 330, 338-39, 132 S.Ct. 1510; id. at 340, 132 S.Ct. 1510 (Alito, J., concurring) ("The Court holds that jail administrators may require all arrestees who are committed to the general population of a jail to undergo visual strip searches!)]”).
“In addressing this type of constitutional claim,” the Court said, harkening back to Bell, “courts must defer to the judgment of correctional officials unless the record contains substantial evidence showing their policies are an unnecessary or unjustified response to problems of jail security.” Id. at 322-23, 132 S.Ct. 1510. In response to plaintiffs proposal to require reasonable suspicion before searching new detainees, the Florence Court held that “[i]t [wás] reasonable ... for correctional officials to conclude this standard would be unworkable.” Id. at 334, 132 S.Ct. 1510. Echoing the jail administrator’s contentions, the Court observed that the offense of arrest is not a reliable indicator of dangerousness; and even if it was, there is often insufficient information about each new detainee’s criminal history in order to make thát assessment; and if there was, officers would “encounter serious implementation difficulties” trying to make those difficult, fact-intensive assessments under “the pressures of the intake process.” Id. at 334-37, 132 S.Ct. 1510. In light of these considerations, the Court held that'the jail’s blanket search policy “struck a reasonable balance between inmate privacy and the needs of the institutions.” Id. at 339, 132 S.Ct. 1510.
Since Florence, our court has decided several cases involving strip searches. Two of these decisions are argued at length in this appeal.
The first is Stoudemire v. Michigan Department of Corrections, 705 F.3d 560 (6th *482 Cir. 2013). In that case, a prison guard subjected the plaintiff to an impromptu strip search while she was standing in a common area of the prison. Id. at 566. When the plaintiff asked why she was being searched, the defendant responded, “[bjecause I can.” Id. at 566-67. The defendant then escorted the plaintiff to her cell, which was adjacent to a busy hallway. Id. at 567. Inside, with the window to the hallway open, the defendant conducted a strip search with a smirk on her face. Id. During the search, the plaintiff could hear people in the hallway and realized that they could see her. Id. This court found the alleged search to be unreasonable. “[A] strip search is a particularly extreme invasion,” we said, and “[t]he location of the strip search made -it more invasive,” as did the manner in which the defendant conducted it. Id. at 573. As for any legitimate penological justification for conducting the search, we concluded that “no special circumstances” such as an “emergency” or “time or resource constraints” justified “strip searching Stoudemire where others could see her naked.” Id. at 574. “[Tjaking the facts as Stoudemire alleged them,” and balancing the significant intrusion against the non-existent penological justifications, we held that “[the plaintiff] has established a constitutional violation.” Id.
The second case is Williams v. City of Cleveland, 771 F.3d 945 (6th Cir. 2014). The issue in Williams was “whether a complaint states a constitutional claim when it alleges that defendant’s jail, instead of using less invasive procedures, compelled pretrial detainees who were being processed into the facility to undress in the presence of other detainees and to have their naked genitals sprayed with delousing solution from a pressurized metal canister.” Id. at 947. Applying Bell’s balancing test, we held such allegations stated a plausible Fourth Amendment claim. Id. at 952-55. Starting from the premise that visual strip searches conducted in private are themselves “an offense to the dignity of the individual,” we concluded that intentionally touching a naked detainee (as the defendants did with the debus-ing agent) and doing so in the presence of other detainees only exacerbates the humiliation and injury to personal privacy that naturally attends strip searches. Id. at 952 (quoting Stoudemire, 705 F.3d at 572-73). In weighing the “significant incursion into plaintiffs’ privacy rights” against the facility’s need to conduct the searches, we cautioned,. “[a]t this juncture in the analysis, the procedural posture of this case is important.” Id. at 954. Because the case came to this court at the motion-to-dismiss stage, “plaintiffs were required only to plausibly allege — rather, than demonstrate — that the jail acted unreasonably.” Id. We held that the plaintiffs’ proposed complaint — which alleged that jail administrators could have allowed detainees to self-apply the debusing agent privately— accomplished that. Id. Because the plaintiffs alleged the availability of “easily implemented and significantly less-invasive alternative^]” to the significantly intrusive searches that were actually conducted, we held that plaintiffs plausibly alleged a Fourth Amendment claim. Id. at 955-56.
C.
The constitutionality of the searches at issue in this case involves a three-step analysis. First, we determine the nature of intrusion, “examining] the scope,' manner, and location of the search.” Stoudemire, 705 F.3d at 572. Second, we “evaluate the need for' the search-, giving due deference to the correctional officer’s exercise of her discretionary functions.” Id. And third, “we determine whether the search was reasonably related to legitimate penological interests by weighing the need against the invasion.” Id.
*483 Nature of the Intrusion. “[A] strip search, by its very nature, constitutes an extreme intrusion upon personal privacy.” Id. (quoting Wood v. Clemons, 89 F.3d 922, 928 (1st Cir. 1996)); see also Williams, 771 F.3d at 952. The act of a stranger examining the most private areas of one’s body “is ‘an offense to the dignity of the individual’ that is ‘undoubtedly humiliating and deeply offensive to many[.]’ ” Williams, 771 F.3d at 952 (quoting Stoudemire, 705 F.3d at 572-73). Intrusive under ideal circumstances, strip searches are especially humiliating when they are conducted in front of other inmates: “The wider an audience for a strip search, the more humiliating it becomes, especially when the stripped individual is exposed to bystanders who do not share the searching officers’ institutional need to view her unclothed.” Id. at 953. The same applies to strip searches conducted in a discourteous manner. See Stoudemire, 705 F.3d at 573.
These basic principles teach us that the Registry searches plaintiff endured constituted a significant intrusion into her bodily privacy. Graham’s visual inspections of plaintiffs naked body, though only skin-deep, constituted a profound intrusion into her personal privacy, an intrusion only magnified by the fact that plaintiff was exposed to several other inmates during each search. Moreover, plaintiff testified that, while she did not believe Graham intended to humiliate or harass her, Graham made several rude comments about her body odor and hygiene, saying she “[s]mells like a funky monkey” and telling her she needed to clean herself better. These comments, while not dispositive of reasonableness, “implicate the dignitary interest ‘inherent in the privacy component of the Fourth Amendment’s proscription against unreasonable searches.’ ” Id. (quoting Brannum v. Overton Cty. Sch. Bd., 516 F.3d 489, 499 (6th Cir. 2008)). Taken together, the scope, manner, and location of the searches overwhelmingly support the conclusion that the searches plaintiff endured were especially intrusive.[3]
Nevertheless, the nature of the intrusion is only part one of the inquiry. An intrusive search is not necessarily an unreasonable one, especially in the corrections setting, where an inmate’s interest in being free from privacy invasions must yield to the realities of operating a safe and effective corrections system. Florence, 566 U.S. at 326-28, 132 S.Ct. 1510. In every case, corrections officials and reviewing courts must balance the intrusion against “the need for the particular search at issue” to determine whether the search is constitutionally tolerable. Stoudemire, 705 F.3d at 573 (internal quotation marks and emphasis omitted). We proceed, then, to the second step of the analysis to determine whether defendants have asserted á legitimate penological justification for conducting the group searches.
Penological Justification. The sort of group searches plaintiff endured were not the norm in the Registry. According to jail policy applicable during plaintiffs detention, guards were to conduct strip searches “out of view of the *484 public and other inmates” “[w]hen possible.”[4] And according to Graham, she followed that policy. “Group searches were the exception,” she said at her deposition, “not the rule.” Thus, the relevant question is whether Graham had a legitimate peno-logical justification for deviating from the general rule. See id. (“We- mhst further determine ‘the need for the particular search’ at issue.” (quoting Bell, 441 U.S. at 559, 99 S.Ct. 1861)). She did.
Graham testified that she conducted group strip searches of up to five inmates when the high volume of inmates demanded it. She explained that when there is a liné of twenty or more women waiting to be processed, conducting one-on-one searches for every inmate “takes a long time,” which in turn causes a ripple effect on the rest of the registration process. For example, when the bottleneck peaks during the afternoon shift, “sometimes [inmates] get left over to midnight shift,” causing additional delays for inmates waiting to see the psychologist who only works the day shift. Conducting individual searches in those circumstances not only impeded the facility’s interest in expeditiously processing incoming inmates, it compromised the health and safety of those inmates caught up in the delay. Again, Graham explained: “I conducted the strip searches as quickly and efficiently as possible,” not only to find contraband, but “to route inmates needing medical care, psychiatric care, or special housing as quickly as possible, because a large number of the female inmates coming into the Jail have mental health issues or need medical care.”
Jeriel Heard, the Chief of Jails and the corrections official who later changed the strip search policy, see supra n.4, recognized the legitimacy of Graham’s justification;
I understood, also, that there-is such pressure on the deputies to get these— particularly the women inmates — processed because so many of them are flagged for seeing a medical'professional or mental health professional ... that the officers may have ... tried to accelerate the way they could get these'inmates ... up to the second floor where the doctors and the nurses are.
Heard continued, emphasizing the health- and-safety implications of a delay in the Registry: “[I]t’s a real challenge to make .sure that we get these inmates processed as quickly as possible ... some of wh[om], by the way, may have been in lockup ... two or three days without psychotropic medication, and they are really acting up.”
Plaintiff gives us nb reason to doubt the legitimacy of defendants’ asserted justification. In this court, she claims in conclu-sory fashion that there was no legitimate penological need for the group searches, but she fails to address the justification put forward" by defendants. And in response to defendants’ motion for summary judgment below, plaintiff presented no evidence to dispute their asserted penological justification, much less “substantial evidence” that Wayne County “exaggerated their response to these considerations.” Bell, 441 U.S. at 548, 99 S.Ct. 1861. In addition, the passage of time appears to have ' validated Graham. Since moving away from periodic group searches, the jail has seen ah increase in delays in the in *485 take process. According to Graham, “[T]he incidence of inmate booking ‘spilling over’ into the next shift has increased,” which in turn has caused an uptick in “incidents of unsearched inmates passing and attempting to pass contraband to searched inmates[] who are waiting to be processed into the jail.” .Graham has also noticed that “the time it takes to get female inmates to medical [personnel] to treat conditions like heroin addiction; seizures; colostomy care; assistive devices (canes, crutches, etc.); mental health treatment; and housing has substantially increased, sometimes by hours.”
For these reasons, and following the Supreme Court’s repeated admonitions in Bell and Florence, we accord considerable deference to defendants’ assertion that they conducted group strip searches when the high volume of inmates and concomitant effect of delays on inmate health and safety demanded it. See Florence, 566 U.S. at 326, 132 S.Ct. 1510 (“[Correctional officials ... must have substantial discretion to devise reasonable solutions to the problems they face.”); Bell, 441 U.S. at 548, 99 S.Ct. 1861 (“[C]ourts should ordinarily defer to their expert judgment in such matters.”).
To summarize, on one hand, the group strip searches plaintiff endured in the Registry were especially intrusive; on the other hand, defendants have asserted a legitimate penological justification for periodically conducting the searches. Typically, we would proceed to balance the nature of the intrusion against the penological justification to determine whether the searches were unreasonable under the Fourth Amendment. However, we need not go that far in order to determine that Graham is entitled to qualified immunity.
Qualified immunity protects a constitutional tortfeasor from personal liability unless the contours of the constitutional right she violated “were sufficiently definite that any reasonable official in the defendant’s shoes would have understood that he was violating it.” Plumhoff v. Rickard, — U.S. -, 134 S.Ct. 2012, 2023, 188 L.Ed.2d 1056 (2014). The dispositive inquiry, “undertaken in light of the specific context of the case, [and] not as a broad general proposition,” is “whether the viola-tive nature of particular conduct is clearly established.” Mullenix v. Luna, — U.S. -, 136 S.Ct. 305, 308, 193 L.Ed.2d 255 (2015) (per curiam) (first quoting Brosseau v. Haugen, 543 U.S. 194, 198, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) (per curiam) and then Ashcroft v. al-Kidd, 563 U.S. 731, 742, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011)).
Nowhere is that specificity as important as in the Fourth Amendment context, where, under the governing ad-hoc interest-balancing test, “[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine ... will apply to the factual situation the officer confronts.” Id. at 308 (quoting Saucier, 533 U.S. at 205, 121 S.Ct. 2151). Because “case-by-case, incremental decisionmaking of balancing tests ... infrequently will provide the ‘fair notice’ that qualified-immunity precedent requires,” Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist., 428 F.3d 223, 234-35 (6th Cir. 2005), “[c]o'urts generally accord public officials wide latitude (for qualified-immunity purposes) when the constitutionality of their acts comes down to the subtleties of interest balancing[.]” Citizens in Charge, Inc. v. Husted, 810 F.3d 437, 443 (6th Cir. 2016). Thus, it is imperative that plaintiff rely on a decision that “squarely governs” the outcome of the case. See Brosseau, 543 U.S. at 201, 125 S.Ct. 596. That she cannot do.
Plaintiff claims that Stoudemire and Williams clearly establish the right at is *486 sue, but these decisions come up short for several reasons. First, Stoudemire and Williams were decided after the events in this case. Thus, the decisions themselves could not have put Graham on notice that her conduct was unconstitutional. Id. at 200 n.4, 125 S.Ct. 596. Plaintiff responds that Stoudemire held that the right at issue in that case was clearly established as early as 2007, several years before the events of this case.[5] See Stoudemire, 705 F.3d at 575 (holding that “the state of the law in existence at the time of the strip search ... was clearly established”). At best, then, plaintiffs argument is one by analogy. But even this argument fails because both Stoudemire and Williams are distinguishable in one important respect: in both cases, there was no penological justification for the particular searches at issue. This critical difference makes Stoud-emire and Williams poor templates for declaring the particularized right at issue in this case — freedom from a group strip search supported by a legitimate penological justification — clearly established. See Brosseau, 543 U.S. at 201, 125 S.Ct. 596 (holding that factually distinguishable circuit precedent “by no means ‘clearly establish’ that [the defendant’s conduct violated the Fourth Amendment”).
First consider Williams. The procedural posture of the case required this court to accept as true the plaintiffs plausible allegation that the defendants had no legitimate justification for conducting group strip searches. Williams, 771 F.3d at 949, 956. Thus, we had no occasion to evaluate any proposed penological justification, let alone weigh it against the nature of the intrusion. Indeed, Williams itself recognized that its holding did not extend to cases like the one before us: “[0]f course, the jail may have had good reasons for conducting these procedures in the particular manner in which it did[,] [b]ut that is a matter for resolution ... on summary judgment!.]” Id. at 955 (citation omitted); see also id. (“Whether the particular manner in which the jail conducted the searches ... was ‘justified’ depends on the facts[.]”).
Unlike Williams, the present case comes to us at the summary judgment stage, and Wayne County and Graham have provided a legitimate penological justification for the periodic group strip searches; a justification that Sumpter has not disputed. As a result, we are obligated to consider their evidence. Compare id. at 956 (“[T]he district court cannot have opined that the jail’s conduct was ‘justified’ without examining the evidence — which, of course, it cannot do when determining merely whether the proposed complaint failed to state a claim.”), with Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (“[A] party seeking summary judgment always bears the initial responsibility of ... identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.” (internal quotations omitted)).
Next consider Stoudemire. The plaintiff in that case presented evidence that there was no exigency or “time or resource constraints” to justify conducting the search where others could see the plaintiff naked, which led this court to hold that the search *487 was “devoid of any legitimate penological justification.” Stoudemire, 705 F.3d at 574-75. In the absence of a governmental interest, the outcome of the balancing test was obvious, so obvious that any reasonable officer in the defendant’s position would have known that the search was unreasonable. Id. at 575; see also Lyons v. City of Xenia, 417 F.3d 565, 579 (6th Cir. 2005) (holding that violation of a “ ‘clearly established’ constitutional right” occurs “where the violation was sufficiently ‘obvious’ under .the general standards of constitutional care”).
In stark contrast to Stoudemire, however, Graham testified without contradiction that she conducted group searches when time and resource constraints required it.’ Cf. Stoudemire, 705 F.3d at 574. Thus, the clearly established right recognized in Stoudemire — a public strip search “devoid” of justification — could not have put a reasonable officer on notice that what Graham did — a group strip search supported by a legitimate penological justification— was unconstitutional.
Plaintiff reads Stoudemire differently. According to Sumpter, Stoudemire “identified a well[-]established right, the right not to be subjected to a humiliating strip search in full view of several (or perhaps many) others unless the procedure is reasonably related to a legitimate penological interest” — a right established long before the events in this case. Id. at 575 (emphasis omitted) (quoting Farmer v. Perrill, 288 F.3d 1254, 1260 (10th Cir. 2002)). But saying “strip searches must be supported by a legitimate justification” is just another way of saying “searches must be reasonable.” As the Supreme Court has emphasized on multiple occasions, “that is not enough.” Saucier, 533 U.S. at 202, 121 S.Ct. 2151; see also al-Kidd, 563 U.S. at 742, 131 S.Ct. 2074 (“We have repeatedly told courts ... not to define clearly established law at a high level of generality.”). “[T]he clearly established law- must be ‘particularized’ to the facts of the case.” White v. Pauly, — U.S. -, 137 S.Ct. 548, 552, 196 L.Ed.2d 463 (2017) (per curiam) (quoting Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). We do not read Stoudemire as ignoring this command. Rather, Stoude-mire held that the particularized right at issue in that case — freedom from an especially intrusive public strip search “devoid” of justification — was clearly established because the outcome of the Fourth Amendment balancing test between weighty privacy interests on one hand and no governmental interest on the other was obvious. See 705 F.3d at 575 (“[A] reasonable officer would have been on notice that the search was unreasonable under the circumstances and devoid of any legitimate penological justification related to security and order.” (emphasis added)). As discussed above, its holding sheds no light on whether Graham’s actions, undertaken in wholly different circumstances, were unconstitutional.
These differences matter because the existence of a countervailing government interest necessarily affects the third step in the constitutional analysis, the balancing calculus. And this is critical for purposes of qualified immunity analysis. Regardless of how the balancing actually plays out, one thing is clear: Stoudemire and Williams could not have predicted the result since neither case involved penological justifications to weigh against the nature of the intrusion.. To put it in more descriptive terms: it is easy enough to predict how scales with one hundred apples on one end will balance out, but it is far more difficult to predict how many Oranges must be added to the other side to bring it to equipoise. Tasked with making that second prediction, Graham would have found no *488 clues in “apples-only” cases like Stoude-mire and Williams.
The dissent starts with the wrong question. It asks whether our case law clearly establishes Officer Graham’s justification for the group searches as a legitimate one. Infra at 494-96. But that’s not how qualified immunity works. To overcome an officer’s request for immunity, the plaintiff must show that the “right” she seeks to vindicate is clearly established, not that the officer’s justification is not clearly established. Wegener v. City of Covington, 933 F.2d 390, 392 (6th Cir. 1991). The issue is the right to be free from a group strip search where the officer has an administrative need to process a large quantity of inmates at one time. The cases fail to address this situation, and so the right is not (and was not) clearly established. In' focusing on only one half of the right-at-issue, the dissent inverts the burden, leaving the officer, rather than the plaintiff, in need of clearly established law to succeed.- The dissent also focuses much of its energy on a question we do not address: whether the searches violate the Fourth Amendment. Its key points — that the jail later changed (or clarified) its policy, that Officer Graham had other alternatives available to her, and that she could have anticipated the situation and planned accordingly — all fail to address whether the law at the time clearly established the searches as Fourth Amendment violations.
The absence of a decision .that “squarely governs” this situation is particularly detrimental to plaintiffs claim because, when the. constitutional test is one of .interest-balancing,, the point at which the constitutional shades into, the unconstitutional will necessarily be gray. Brosseau, 543 U.S. at 201, 125 S.Ct. 596. Qualified immunity exists to give public officials breathing room to make close calls when the issue is not black-and-white. al-Kidd, 563 U.S. at 743, 131 S.Ct. 2074. And this breathing room is especially appropriate when the legal standard is flexible and heavily dependent on on-the-ground judgment calls, as it is in this context. See Florence, 566 U.S. at 326, 132 S.Ct. 1510 (“[Cjorrectional officials ... must have substantial discretion to devise reasonable solutions to the problems they face.”); Bell, 441 U.S. at 559, 99 S.Ct. 1861 (“The test of reasonableness ... is not capable of precise definition or mechanical application.”); see also Hernandez v. O’Malley, 98 F.3d 293, 297 (7th Cir. 1996) (“Contextual balancing tests should be worked out prospectively, rather than at the expense of public officials who guess wrong about future legal developments.”). Strip searches, even when conducted in the most private circumstances, are intrusive. But in the absence of bright lines and per se prohibitions, whether and when to subject inmates to. increasingly intrusive searches depends on the facts confronting the corrections official in each particular case.
For these reasons, we need not conduct the Fourth Amendment analysis to its completion in order to conclude that Graham is entitled to qualified immunity. Neither Stoudemire, nor Williams, nor any other case, would have put Graham on notice that conducting group strip searches when the volume of inmates made individual searches imprudent was unreasonable. Thus, regardless of whether Graham, in fact, violated -the Fourth Amendment, no reasonable officer would have known that at the time. We therefore hold, as the district • court did, that defendant Graham is entitled to qualified immunity.
IV.
The district court also granted summary judgment in favor of Wayne County and the Wayne County Sheriff in his official *489 capacity on plaintiffs Fourth Amendment claim regarding the cellblock search.[6] Accepting plaintiffs testimony that three male guards may have observed the cell-block search, the district court ruled that “municipal liability cannot be imposed upon the defendant county based upon a single incident of an alleged tortfeasor’s conduct.”
Plaintiff argues that the district court mistakenly held that her cellblock search was a “single incident.” She contends that the record contains hundreds of affidavits from former inmates recounting similar incidents, evidence she contends demonstrates that Wayne County had a policy of permitting this unconstitutional conduct. Only by turning a “blind eye toward this record evidence,” plaintiff argues, could the district court hold that hers was an isolated incident.
The problem with plaintiffs argument is reflected in her choice of idiom. To “turn a blind eye” presupposes someone has been given information that he prefers to ignore. See blind, Oxford Dictionary of English Idioms (3d ed. 2009) (explaining that the phrase is a reference to Admiral Horatio Nelson, who, after receiving word that his superior officer was signaling him to stand down at the Battle of Copenhagen, lifted his telescope to his blind eye, “thereby ensuring that he failed to see his superior’s signal to discontinue the action”). That did not happen in this case.
 The record shows that plaintiff failed to marshal the collection of affidavits in an effort to establish that the cellblock search was not an isolated incident. Plaintiff insists she did so by dropping a footnote in response to defendant’s motion and stating that she “relies on, and incorporates herein, the affidavits ' in opposition to summary judgment.” But this is the summary judgment equivalent of “hid[ing] elephants in mouseholes.” See Whitman v. Am. Trucking Ass’ns, 531 U.S. 457, 468, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001). The context of this offhand reference — during a separate argument that Graham’s Registry searches were unreasonable — shows that she did not employ the affidavits in support of her cellblock search claim. In fact, Sumpter did not mention this Monell claim at all in her response to summary judgment. Her brief refers only to the group strip search Monell claims, not the cell-block searches in front of male officers, and even then only in a single offhand remark.[7] In short, because plaintiff failed to bring the affidavits to the district court’s attention in connection with the cellblock claim, it had no occasion to consider them in that context. Chicago Title *490 Ins. Corp. v. Magnuson, 487 F.3d 985, 995 (6th Cir. 2007) (“[T]he opposing party ‘has an affirmative duty to direct the court’s attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact.’” (quoting In re Morris, 260 F.3d 654, 665 (6th Cir. 2001))). Nor will we fault the district court for failing to do so. We have said time and again, district courts cannot be expected to dig through the record , to find the seeds of a party’s cause of action. See, e.g., Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479-80 (6th Cir. 1989). Plaintiff must mark each site, identifying the genuine disputes of fact that preclude summary judgment on a particular claim. Stiles ex rel. D.S. v. Grainger Cty., Tenn., 819 F.3d 834, 847 (6th Cir. 2016). The district court had no obligation to do plaintiffs work for her, nor do we. We therefore affirm the decision granting summary judgment in favor of defendants on the cellblock search claim.[8]
V.
This leaves plaintiffs claims for injunc-tive and declaratory relief. The district court held that these claims were moot because plaintiff was no longer housed at the Wayne County Jail and the Wayne County Jail formally changed its policy to prohibit group strip searches. We affirm the decision to grant summary judgment on these claims, though we conclude that the doctrine of standing, as opposed to mootness, is the correct rationale.
The doctrines of standing and mootness are similar, but they are not the same. See City of Los Angeles v. Lyons, 461 U.S. 95, 109, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). Standing seeks to ensure the plaintiff has a “personal stake in the outcome of the controversy” at the outset of litigation. Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). Mootness, on the other hand, “is akin to saying that, although an actual case or controversy once existed, changed circumstances have intervened to destroy standing.” In re: 2016 Primary Election, 836 F.3d 584, 588 (6th Cir. 2016). The common refrain that mootness is just “standing set in a time frame” best captures the temporal distinction; standing applies at the sound of the starting gun, and mootness picks up the baton from there. See U.S. Parole Comm’n v. Geraghty, 445 U.S. 388, 397, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980) (quoting Monaghan, Constitutional Adjudication: The Who and When, 82 Yale L.J. 1363, 1384 (1973)). That temporal distinction is relevant, at least in relation to the district court’s decision, because plaintiffs claims for injunc-tive and declaratory relief did not present an actual case or controversy at the time she filed her complaint. Hence, it is more accurate to say she lacked standing to bring these claims, rather than say they are moot.
To satisfy Article III standing, plaintiff must show, among other things, that she “suffered an ‘injury in fact,’” Lujan v. Defs. of Wildlife, 504 U.S. 555, *491 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (citations omitted), and she must do so for each form of relief, Lewis v. Casey, 518 U.S. 343, 358 n.6, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) (“[Standing is not dispensed in gross.”). In the context of claims for injunctive or declaratory relief, “a plaintiff must show that he is under threat of suffering ‘injury in fact’ that is concrete and particularized,” and that “threat must be actual and imminent, not conjectural or hypothetical[J” Summers v. Earth Island Inst., 555 U.S. 488, 493, 129 S.Ct. 1142, 173 L.Ed.2d 1 (2009). “[P]ast exposure to illegal conduct ... unaccompanied by any continuing, present adverse effects,” will not suffice to establish “a present case or controversy.” Lyons, 461 U.S. at 102, 103 S.Ct. 1660 (quoting O’Shea v. Littleton, 414 U.S. 488, 495-96, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974)). Yet, “past exposure to illegal conduct” is precisely what plaintiff alleges here.
Sumpter claims she was subjected to four separate strip searches as an inmate in the Wayne County Jail between October and November 2012. However, she left the jail in November 2012, and we can only speculate as to whether she will ever return. At this juncture, we must assume that plaintiff “will conduct [her] activities within the law and so avoid ... exposure to the challenged course of conduct.” O’Shea, 414 U.S. at 497, 94 S.Ct. 669. The likelihood of future injury is further diminished by the fact that defendants have changed their official policy to prohibit group strip searches. In the absence of evidence demonstrating a “sufficiently real and immediate” threat of being subjected to group strip searches at the Wayne County Jail again, id. at 496, 94 S.Ct. 669, plaintiff has failed to establish standing to seek injunctive or declaratory relief, see Grendell v. Ohio Supreme Court, 252 F.3d 828, 832 (6th Cir. 2001) (“[P]ast injury [with] no continuing, present adverse effects ... cannot establish standing for declaratory and injunctive relief”).
The foregoing renders plaintiffs challenges to the district court’s decision moot. She argues that the district court’s reasoning overlooks cases like Gerstein v. Pugh, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), and Sosna v. Iowa, 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975), which she claims recognize a special rule in putative class action cases where the named plaintiffs claim is mooted before the class can be certified. But those cases are no help to plaintiff because the complaining parties had a live, actionable claim for injunctive relief at the time they filed suit — which is to say, they had standing. See Gerstein, 420 U.S. at 110 n.11, 95 S.Ct. 854; Sosna, 419 U.S. at 402, 95 S.Ct. 553. Plaintiff also insists that her suit fits the exception for cases that are “capable of repetition, yet evading review.” But that exception cannot cure lack of standing, see Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 190-91, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000), and even in the mootness context, it only applies when “there is a reasonable expectation that the same complaining party will be subject to the same action again,” Spencer v. Kemna, 523 U.S. 1, 17, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998) (bracketing omitted) (emphasis added) (quoting Lewis v. Cont’l Bank Corp., 494 U.S. 472, 481, 110 S.Ct. 1249, 108 L.Ed.2d 400 (1990)). Again, there is no indication that plaintiff intends to return to the Wayne County Jail anytime soon. We therefore affirm the district court’s decision to grant summary judgment on plaintiffs claims' for injunctive and declaratory relief.
*492 VI.
We do not underestimate the severity of-the intrusions plaintiff endured during her incarceration in the Wayne County Jail. The practice of strip searches “instinctively gives us the most pause.” Bell, 441 U.S. at 558, 99 S.Ct. 1861. However, our task is to determine whether the particularized right implicated by defendant’s actions was clearly established at the time plaintiff was searched. For the reasons explained above, we hold that it was not. We further' conclude that the district- court properly granted summary judgment in favor of defendants on plaintiffs cellblock claim and claims for injunctive and declaratory relief.
We therefore affirm the judgment of the district court.

. Following her arrest for multiple felonies arising out of a motor vehicle accident, Sumpter was incarcerated in the Wayne County Jail from October 10 to November 13, 2012, at which time she was transferred to the Michigan Department of Corrections to *479 serve a prison term of one-to-five years. On October 29, 2012, she entered a plea of nolo contendere and was sentenced on November 12, 2012.

. Plaintiff challenges these two rulings on appeal, but her arguments are contingent on success with respect to at least one of her substantive claims. In light of our decision to affirm the summary judgment in defendant’s favor, we need not address these claims.

. Our conclusion is based solely on the evidence pertaining to the three searches of plaintiff. Although plaintiff presents evidence that other inmates endured similar group searches, that evidence is irrelevant to whether the specific searches of plaintiff were unreasonable. See Warshak v. United States, 532 F.3d 521, 528 (6th Cir. 2008) (en banc) (stating that questions of Fourth Amendment “reasonableness” involve "case-by-case determinations”); see also Courtright v. City of Battle Creek, 839 F.3d 513, 518 (6th Cir. 2016) (stating that the test of qualified immunity is whether the "official’s acts violated the plaintiff's clearly established constitutional right” (emphasis added) (citation omitted)).

. Approximately one year after plaintiff left the Wayne County Jail, the facility changed its policy to allow only individual strip searches; a change defendants insist was taken as a "precautionary measure,” and “not because the- Sheriffs Office believed that the policy or method of searching was improper.” We confine our qualified immunity analysis to the time of the contested searches,

. We note that this response does not save plaintiff’s argument as it pertains to Williams, since Williams did not involve qualified immunity and thus had no occasion to declare that the right at issue was clearly established by 2012. See generally, Williams, 771 F.3d 945. But even if that were not the case, there is a more fundamental problem with plaintiff's reliance on Williams, as explained in the text.

. The dissent would also allow Sumpter's "individual” claim regarding the cellblock search in the presence of male officers to proceed. Infra at 488-89. The main problem is that Sumpter has no' such claim. Sumpter sued only one officer individually: Officer Graham. And while Sumpter alleges that Graham participated in the intake searches, she does not allege that Graham participated .in the cell-block search. As to that search, Sumpter sued only the County and the County’s sheriff (in his official capacity).

. Plaintiff apparently thought defendants were not seeking summary judgment on this claim. At the outset of her response, she stated, "Defendants are not seeking summary judgment as to Plaintiff's claims that her strip search, in the presence of members of the opposite sex, was a violation of her Fourth Amendment rights.” She was mistaken. The final section-of defendants’ motion for summary judgment, entitled "Plaintiff Cannot Establish a Municipal Liability Claim Under § 1983,” argued, "[Ejven. assuming that Plaintiff was searched in the manner alleged in her deposition testimony, this single instance of male deputies being in the duty station during the search is insufficient to establish that Wayne County had an unconstitutional policy of forcibly exposing female inmates in a state of undress to male guards.”

. We also note that, because Sumpter has not shown that the group Registry searches violated clearly established law, Wayne County cannot be liable for failing to train its officers to avoid them. Municipalities are liable for a failure to train when the failure amounts to a deliberate indifference to the rights of persons with whom its officers come into contact. City of Canton v. Harris, 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). But a municipality cannot be deliberately indifferent for failing to train officers to avoid constitutional violations that have not been clearly established as such. Hagans v. Franklin Cty. Sheriff's Office, 695 F.3d 505, 511 (6th Cir. 2012); Arrington-Bey v. City of Bedford Heights, Ohio, 858 F.3d 988, 995 (6th Cir. 2017).