RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 18a0245p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

TYNISA WILLIAMS, individually and on behalf of a class of others similarly situated,

*Plaintiff-Appellee*,

*v.*

CITY OF CLEVELAND,

*Defendant-Appellant*.

Nos. 16-4237/17-3508

———————————

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 1:09-cv-02991—Benita Y. Pearson, District Judge.

Argued: June 7, 2018

Decided and Filed: November 2, 2018

Before: SILER, COOK, and WHITE, Circuit Judges.

———————————

## COUNSEL

**ARGUED:** Stephen W. Funk, ROETZEL & ANDRESS, LPA, Akron, Ohio, for Appellant. Elmer Robert Keach, III, LAW OFFICES OF ELMER ROBERT KEACH, III, PC, Albany, New York, for Appellee. **ON BRIEF:** Stephen W. Funk, ROETZEL & ANDRESS, LPA, Akron, Ohio, Thomas J. Kaiser, CITY OF CLEVELAND, Cleveland, Ohio, for Appellant. Elmer Robert Keach, III, LAW OFFICES OF ELMER ROBERT KEACH, III, PC, Albany, New York, D. Aaron Rihn, ROBERT PEIRCE & ASSOCIATES, PC, Pittsburgh, Pennsylvania, Nicholas Migliaccio, MIGLIACCIO & RATHOD, LLP, Washington, D.C., Daniel Karon, KARON LLP, Cleveland, Ohio, for Appellee.

SILER, J., delivered the opinion of the court in which COOK, J., joined, and WHITE, J., joined in part. WHITE, J. (pp. 17–21), delivered a separate opinion concurring in part and dissenting in part.

———————————

**OPINION**

———————————

SILER, Circuit Judge.   In 2009, Tynisa Williams brought suit against the City of Cleveland ("the City"), on behalf of herself and others similarly situated,[1] pursuant to 42 U.S.C. § 1983.   She alleged that the City's intake procedures conducted at its House of Corrections ("HOC")—consisting of strip searches and mandatory delousing—violated the Fourth Amendment to the U.S. Constitution.

Williams's case first came before this court in 2014, on appeal from the district court order granting the City's motion for judgment on the pleadings.  *Williams v. City of Cleveland* (*Williams I*), 771 F.3d 945 (6th Cir. 2014).   We found that Williams's second amended complaint set forth a plausible claim for relief.   On remand, and after extensive discovery, the district court granted Williams's motion for summary judgment in part and denied the City's motion in part.[2]   It thereafter issued a permanent injunction in Williams's favor, which enjoined the City from reinstituting its previous delousing method and from conducting group strip searches without installation of privacy partitions to obstruct the view of other inmates.  *Williams v. City of Cleveland* (*Williams II*), 210 F. Supp. 3d 897, 908-09 (N.D. Ohio 2016).

The City now appeals the district court's summary judgment and permanent injunction orders.[3]   For the reasons stated herein, we **reverse** the district court's orders and **remand** with instructions to grant summary judgment in favor of the City on all counts and to vacate the permanent injunction.

———————————

[1]The district court never certified a class, however.

[2]The district court granted the City summary judgment on Williams's second cause of action, relating to involuntary medical treatment, which is not before us on appeal.   The district court granted Williams's motion for summary judgment on her other claims.  210 F. Supp. 3d at 909.

[3]The City separately appealed the district court's summary judgment opinion and order and its order granting a permanent injunction.   The appeals have been consolidated under App. R. 3(b).

**FACTUAL AND PROCEDURAL HISTORY**

On October 30, 2009, Williams was pulled over and cited for driving with a suspended license. She was brought into the Justice Center, Cleveland's downtown city jail. After spending the night in the downtown jail, Williams was driven to the HOC in a van with several other inmates. She was placed in a holding cell for three to four hours with approximately ten other female detainees. A female correctional officer took her to a back room with two other female detainees and gave them uniforms. The officer then provided the detainees with lock bins in which to store their street clothes and ordered the detainees to remove their clothing, including their bras and underwear. The detainees were then ordered to get into the shower, which had three separate stalls, and they were given about one minute to shower. The women were ordered to exit the shower, which left them standing approximately one foot from each other in the nude.

The correctional officer then proceeded to spray the detainees with a delousing solution, one at a time. Williams stated during her deposition that they were sprayed "over the whole body," from head to toe, with a "body mist." The solution "smelled like bug spray" and was sprayed on the detainees through a nozzle attached to a jug. Williams asserted that the officer was only standing six inches away from the inmates when they were sprayed. After delousing their front sides, the officer asked them to turn around, with their arms out and legs spread. Williams testified that she was ordered to "squat" during the delousing, but she was unaware of whether everyone who underwent the intake process was asked to squat while being deloused. Williams claimed that the spray "penetrated [her] anus." Williams admitted, however, that the spray was a "light mist," which did not "hit [her] with any kind of force." She only felt the mist because "it was a liquid and cold."

The officers then directed the detainees to put on their uniforms, without being given the opportunity to shower again. Williams waited for ten to fifteen minutes in the holding cell before being escorted to the pod: a large room with several bunks. She was then immediately released on bail, at approximately 6:00 p.m.

Later in 2009, Williams brought this class action against the City, arguing that she and similarly situated pretrial detainees were deprived of their Fourth Amendment rights when they

were subjected to mandatory strip searches and delousing upon entry at the HOC without individualized suspicion of lice or concealed contraband. She sought monetary damages, a declaration that the City's policies were unconstitutional, and an injunction precluding the City from continuing its allegedly unconstitutional practices.[4]

## I.     Stay Resulting From *Florence*

In 2011, the Supreme Court granted a writ of certiorari to resolve the question of whether pretrial detainees could be strip searched upon entry into jail without individualized suspicion. *Florence v. Bd. of Chosen Freeholders of Cty. of Burlington*, 563 U.S. 917 (2011). The district court granted the City's motion to stay Williams's class action until the Supreme Court decided *Florence*. The Court handed down its decision in 2012 and held that "undoubted security imperatives involved in jail supervision override the assertion that some detainees must be exempt from the more invasive search procedures at issue absent reasonable suspicion of a concealed weapon or other contraband." *Id. at* 330. The Supreme Court clarified, "[t]here also may be legitimate concerns about the invasiveness of searches that involve the touching of detainees[,]" but it did not reach that issue in *Florence* because no such facts were alleged in that case. *Id.* at 339. Moreover, as noted by the Fourth Circuit in *Cantley v. West Virginia Regional Jail & Correctional Facility Authority*, "[t]he Supreme Court did not expressly reach the delousing issue in [*Florence*], simply commenting that '[t]he danger of introducing lice or contagious infections' into a detention facility 'is well documented.'" 771 F.3d 201, 206 n.3 (4th Cir. 2014).

The district court lifted the stay in Williams's case in August 2012 and granted Williams's motion to amend her complaint to add a class representative.[5] The City moved for judgment on the pleadings, and Williams responded in opposition with a proposed second

---

[4]Williams was again incarcerated at the HOC on September 21, 2011, on unrelated charges. She stated during her deposition that the intake procedure "was basically the same without the delousing." Williams was held at the HOC again on March 8, 2012, for a period of 62 days, and she experienced the same intake procedure on that occasion as she did in 2011. Finally, Williams was incarcerated at the HOC for one day in 2014 and again underwent the same intake procedure as 2011 and 2012.

[5]In December 2015, the district court granted the City's unopposed motion to dismiss the intervening plaintiff, Sean Bealer.

amended complaint. Williams alleged in her proposed complaint that the City employed a policy of directing correctional officers to "use pressurized metal spray cans to spray caustic delousing solution over the naked bodies and genitals of detainees." She took issue not only with "the use of delousing on all detainees, but also about the manner in which the delousing occurs." Williams alleged that the City directed correctional officers to "[f]orcibly spray[] the genitals of detainees, versus allowing detainees to apply the delousing solution themselves." Williams specifically claimed that the "delousing solution was sprayed all over her body, including into her anus when she bent over." The district court granted the City's motion for judgment on the pleadings and denied Williams's motion for leave to amend her complaint based on futility of the proposed amendment.

## II.     *Williams I* Ruling

Williams appealed to this court, which affirmed in part and reversed in part. *Williams I*, 771 F.3d at 956. In *Williams I*, we considered a single issue: whether Williams's proposed complaint plausibly alleged a violation of the Fourth Amendment by claiming that the City's jail, "instead of using less invasive procedures, compelled pretrial detainees who were being processed into the facility to undress in the presence of other detainees and to have their naked genitals sprayed with delousing solution from a pressurized metal canister." *Id.* at 947. We found that Williams's proposed amended complaint had stated a claim for relief because it alleged facts indicating that the City conducted searches in an unreasonable manner. *See id.* at 952 (stating that, "although *Florence* permits the jail to conduct a suspicionless search of plaintiffs upon their entrance to the jail, the search must be conducted in a manner that is reasonably related to the jail's legitimate objectives in discovering contraband and preventing the introduction of lice to the facility" (citations omitted)). Thus, we previously concluded that, unless the City demonstrated a "good reason" for delousing inmates rather than allowing them to self-apply, such a decision would be a "needless intrusion into the detainees' constitutional rights." *Id.* at 955. Such a determination was left for trial or summary judgment, and we remanded Williams's matter to the district court for further proceedings. *Id.*

### III.        Summary Judgment Evidence

Back in the district court, both Williams and the City moved for summary judgment. Counsel filed the deposition transcripts of Mary Bounds, David Carroll, Lieutenant Stella Clark, Reginald Flowers, Jacqueline Lewis, Lieutenant Joseph Stottner, and Lieutenant Rufus Williams. The testimony of these officials partially confirmed Williams's experience in October 2009 and partially contradicted Williams's account of the HOC intake procedure at that time.

According to these correctional officers, in the fall of 2009 the HOC had a policy of strip searching and delousing inmates upon arrival. Because large groups of detainees were often transported to the HOC at once, officers would sometimes conduct this procedure with two or three inmates at a time, in order to expedite the intake process. An officer of the same sex would bring the inmates into a shower room and instruct them to undress and put their clothing inside a lock box. The officer would then conduct a quick "visual observation" of the detainees "to ensure that contraband or anything illegal [wa]s not transformed over or transported over into a pod." According to Acting Commissioner Bounds, the visual observation was performed "for the safety of that inmate, other inmates, and even the correction officers." Moreover, officers checked for medical problems and health concerns.

The officer would then order the detainees to stand in a vestibule, and would spray a delousing solution on the inmates, one at a time. The delousing solution was administered via a pressurized canister, through a nozzle on the end of a hose attached to the can. The liquid was sprayed lightly, like a fine mist, from a distance of approximately three or four feet. The officer would ask the detainee to spread her legs shoulder width apart and raise her arms. After spraying the front of the detainee's body, the officer would ask her to turn, while keeping her legs spread and arms in the air, and spray the back of the detainee's body. Inmates were not asked to bend at the waist or to squat as part of this process. After the officer sprayed detainees with the delousing solution, they were typically permitted to shower and dry off.

The HOC's delousing policy "was instituted for health and safety reasons" in order "to prevent lice, crabs, bugs, insects from coming in there and spreading." "It was brief, painless and necessary to prevent an infestation in the dormitories at the workhouse." According to these

correctional officers, inmates never objected to being deloused or to undressing in front of other inmates of the same sex.

The correctional officers stated that they did not allow detainees to self-apply the solution because they could not trust the detainees to follow the procedure properly. Inmates did not always follow instructions, and unlike an inmate's decision not to eat or shower, an inmate's decision not to apply the solution could "compromise the whole institution." The correctional officers contended that, if given the opportunity to self-apply, an inmate could pour the solution down the drain, only apply the solution to part of her body, or throw the solution on the officer or other detainees.

Commissioner Lewis discontinued the HOC delousing procedure in April 2010. After suspending the delousing procedure, correctional officers at the HOC began sending infected detainees to the medical unit. Lewis questioned this decision later, after a jail manager informed her that they had experienced a few lice outbreaks. "I felt like we would have more outbreaks more often if we discontinued it," stated Lewis, "and that has come true." According to some of the correctional officers, this procedure had worked well thus far, as no serious cases of lice infestations had occurred. Others believed, however, that they had just "been fortunate so far."

## IV.     District Court Orders

The district court granted Williams's motion in part, awarding summary judgment to Williams on her Fourth Amendment claim challenging the manner in which the City conducted delousing and strip-search procedures. The district court acknowledged that, post-*Florence*, "there is no longer any question that individualized suspicion is unnecessary to conduct blanket strip searches and to delouse prisoners at intake." It correctly noted, in light of our ruling in *Williams I*, that "[t]he method of the strip search and the delousing are, however, still subject to constitutional evaluation."

The district court considered facts such as Williams's allegation "that the delousing solution penetrated her anus" and found that the City's delousing policy was unconstitutional. Although the City argued that its delousing procedure was justified because "corrections officers could not 'trust' inmates to perform the procedure properly," the district court found that this

method was not "reasonably related to the legitimate end of preventing the dissemination of lice." In short, the district court concluded, "The application of the delousing solution in this manner is not a rational response to the jail's legitimate interest in preserving health and well-being within the facility, given other less humiliating and invasive alternative methods to eradicate lice, such as permitting detainees to self-apply the delousing solution."

With regard to Williams's strip-search claim, the district court found that the City's policy of strip searching multiple detainees at a time "did not strike a reasonable balance between [Williams's] privacy interests and the need to provide safety and security at the jail." The court rejected the City's provided justification "that the jail was 'busy,' and corrections officers need to strip search multiple detainees for expediency."

The district court also issued a permanent injunction forbidding the City from conducting: (1) "the physical delousing of detainees . . . by utilizing a pressurized spray canister" except "in instances of purposeful avoidance or misapplication of a delousing solution by a detainee"; and (2) "the showering of detainees in the jail booking area absent detainees being allowed to enter and use those showers in the absence of any other detainees." If the City chose to conduct strip searches during the intake process in groups of two or more, the district court ordered that the City "must install a privacy partition/curtain between the detainees being searched to completely preclude each detainee from seeing the other in a state of partial and/or complete undress." If the City did not install such partitions, the strip searches had to be "conducted individually and privately."

The City now appeals the district court's decisions partially granting summary judgment in favor of Williams, partially denying summary judgment to the City, and issuing a permanent injunction against the City.

**STANDARD OF REVIEW**

We review a district court's grant of summary judgment *de novo*, utilizing the Federal Rule of Civil Procedure 56(c) standard. *V&M Star Steel v. Centimark Corp.*, 678 F.3d 459, 465 (6th Cir. 2012). Summary judgment is appropriate only when the evidence, taken in the light most favorable to the nonmoving party, establishes that there is no genuine issue as to any

material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## DISCUSSION

### I.          Standing

Before proceeding to the merits of Williams's Fourth Amendment claim, we must first determine whether Williams had standing at the time of her complaint to request declaratory and injunctive relief.  Even if the City did not raise this argument below, as argued by Williams, "constitutional standing is always a 'threshold inquir[y] which this court is obligated to consider prior to asserting jurisdiction over [an] appeal.'"  *Newsome v. Batavia Local Sch. Dist.*, 842 F.2d 920, 922 (6th Cir. 1988) (quoting *Allstate Ins. Co. v. Wayne Cty.*, 760 F.2d 689, 691 (6th Cir. 1985)); *see also Adarand Constructors, Inc. v. Mineta*, 534 U.S. 103, 110 (2001) ("We are obliged to examine standing *sua sponte* where standing has erroneously been assumed below." (citation omitted)).

Standing ensures that the plaintiff has a "personal stake in the outcome of the controversy" at the outset of litigation.  *Baker v. Carr*, 369 U.S. 186, 204 (1962).  In order to satisfy Article III standing, Williams must show, among other things, that she "suffered an injury in fact."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotation marks and citations omitted).  "[S]he must do so for each form of relief," *Sumpter v. Wayne Cty.*, 868 F.3d 473, 491 (6th Cir. 2017) (internal citation omitted), because "standing is not dispensed in gross," *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996).

When seeking injunctive or declaratory relief, "a plaintiff must show that [s]he is under threat of suffering 'injury in fact' that is concrete and particularized," and the "threat must be actual and imminent, not conjectural or hypothetical[.]"  *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (citation omitted).  "Past exposure to illegal conduct . . . unaccompanied by any continuing, present adverse effects, will not suffice to establish a present case or controversy."  *Sumpter*, 868 F.3d at 491 (internal citations, quotation marks, and brackets omitted).

In *Sumpter*, this court found that the plaintiff lacked standing to seek declaratory and injunctive relief because she "did not present an actual case or controversy at the time she filed her complaint." *Id.* at 490. The plaintiff in *Sumpter* claimed that she was subjected to group strip searches while incarcerated at the county jail. But she left the jail before filing an action seeking injunctive relief, and the court could "only speculate as to whether she will ever return." *Id.* at 491. The court found that it had to assume the plaintiff would follow the law in the future and thus avoid exposure to future potential searches. *Id.* Moreover, the county had changed its policy to prohibit group strip searches. *Id.* Thus, the court found that the plaintiff failed to establish standing to seek injunctive and declaratory relief. Even if her complaint met exceptions to the mootness doctrine, such exceptions could not "cure lack of standing." *Id.*

Here, Williams did not have standing to seek declaratory or injunctive relief for the same reasons that the plaintiff in *Sumpter* lacked standing. She was not in the custody of the City at the time she filed the instant action, and we must assume that she will not return to the HOC in the future. The fact that Williams returned to the HOC three times after filing the instant complaint—the most recent example being approximately four years ago—does not confer standing because the relevant inquiry is whether she had a live, actionable claim for relief at the time she filed suit. *See id.* (concluding that the plaintiff lacked standing because her "claims for injunctive and declaratory relief did not present an actual case or controversy at the time she filed her complaint"). Moreover, the City had discontinued its delousing policy by the time Williams returned to the HOC in 2011.[6] Thus, the threat of future injury against Williams is more "conjectural" and "hypothetical" than "real and immediate." *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974) (internal citations omitted).

The class action nature of Williams's complaint also does not cure her standing dilemma. This factor could potentially solve mootness issues, but it does not affect whether Williams, as the named plaintiff, had "a live, actionable claim for injunctive relief at the time [she] filed suit."

---

[6]Williams testified that she was still strip searched in front of other detainees during her three subsequent trips to the HOC. Consequently, this factor only weighs against Williams with regard to her standing to seek declaratory and injunctive relief from the City's delousing policy. The threat of future group strip searches is still insufficiently "real and immediate," however, seeing as Williams has not been incarcerated at the HOC since 2014, and we must assume that she will act as a law-abiding citizen in the future. *See Sumpter*, 868 F.3d at 491.

*Sumpter*, 868 F.3d at 491; *see O'Shea*, 414 U.S. at 494 ("[I]f none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class." (citations and footnote omitted)).

The district court, therefore, erred by granting Williams's motion for summary judgment on her third and fourth causes of action—demanding declaratory and injunctive relief—because Williams lacked standing to bring these claims. *See Grendell v. Ohio Supreme Court*, 252 F.3d 828, 832 (6th Cir. 2001) ("[P]ast injury [with] no continuing, present adverse effects . . . cannot establish standing for declaratory and injunctive relief."). We accordingly reverse those portions of the district court's orders.

## II. Merits of Fourth Amendment Claim

We must now consider whether the district court erred in granting Williams summary judgment on the substance of her Fourth Amendment claim against the City. It is well-established that local governing bodies may be sued directly under 42 U.S.C. § 1983 for monetary damages. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). However, "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Id.* at 694. It may only be sued "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Id.*

Here, Williams brought suit against the City of Cleveland, alleging that the City implemented strip-search and delousing policies that violated her Fourth Amendment rights, as well as the rights of other pretrial detainees who were similarly situated.[7] Thus, we must determine, based on the undisputed facts, whether the City executed a policy or custom that led to a violation of Williams's rights.

---

[7]The City denies having implemented a "strip search" policy. Rather, according to the City, its officers merely visually inspected detainees while they were changing clothes during intake. The Supreme Court has stated, however, that the term "strip search" may refer to various procedures. Specifically, it "may refer simply to the instruction to remove clothing while an officer observes from a distance of, say, five feet or more; it may mean a visual inspection from a closer, more uncomfortable distance." *Florence*, 566 U.S. at 325. We will, therefore, refer to the City's policy of asking detainees to fully undress in the presence of corrections officers as a "strip search."

The Fourth Amendment does not prohibit all invasive searches and seizures—only those that are "unreasonable." *Bell v. Wolfish*, 441 U.S. 520, 558 (1979). "Whether a prison search is constitutionally reasonable depends on 'whether the jail's need for the particular search' outweighs 'the invasion of personal rights that the search entails.'" *Salem v. Mich. Dep't of Corr.*, 643 F. App'x 526, 530 (6th Cir. 2016) (quoting *Williams I*, 771 F.3d at 950). Our Fourth Amendment analysis, therefore, involves balancing the need for the search against the privacy invasion resulting from the search. *See Bell*, 441 U.S. at 559. This inquiry can be divided into three considerations: (1) the nature of the intrusion, considering "the scope, manner, and location of the search"; (2) "the need for the search, giving due deference to the correctional officer's exercise of her discretionary functions"; and (3) "whether the search was reasonably related to legitimate penological interests by weighing the need against the invasion." *Stoudemire v. Mich. Dep't of Corr.*, 705 F.3d 560, 572 (6th Cir. 2013) (citation omitted). We may also examine "obvious, easy alternatives that accommodate the inmate's privacy interests at little cost to valid penological objectives." *Salem*, 643 F. App'x at 530 (quoting *Williams I*, 771 F.3d at 950).

We afford significant deference to correction facilities' decisions in implementing security measures. *See Florence*, 566 U.S. at 322-23 ("[C]ourts must defer to the judgment of correctional officials unless the record contains substantial evidence showing their policies are an unnecessary or unjustified response to problems of jail security."); *Bell*, 441 U.S. at 547 ("Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." (citations omitted)). "A prison's regulations need only be 'reasonably related to legitimate penological interests.'" *Stoudemire*, 705 F.3d at 571-72 (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)).

Williams challenges both the City's strip-search policy and its now-discontinued practice of delousing detainees. Although these challenges involve identical legal frameworks, we must separately consider each policy's privacy implications and the City's respective justifications.

A.      **Group Strip Searches**

As to the City's strip-search policy, the parties agree that the Supreme Court held in *Florence* that "detainees may be subjected to suspicionless strip searches as part of the jail's intake process." *Sumpter*, 868 F.3d at 478 (citing *Florence*, 566 U.S. at 328). "But it is settled that the law demands an adequate need for a strip search, and, depending on the circumstances and context, restricts the scope, manner, and place of the search." *Stoudemire*, 705 F.3d at 574 (citing *Bell*, 441 U.S. at 559). Thus, we must decide whether the City's manner of conducting strip searches was reasonable. Unlike in *Williams I*, we now consider whether there exists a genuine issue of material fact after examining the record, as opposed to whether Williams's second amended complaint stated a plausible claim for relief. *See Williams I*, 771 F.3d at 954 ("At this juncture in the analysis, the procedural posture of this case is important. To state a claim, plaintiffs were required only to plausibly allege—rather than demonstrate—that the jail acted unreasonably." (citations omitted)).

With regard to the nature of the intrusion, "a strip search, by its very nature, constitutes an extreme intrusion upon personal privacy." *Stoudemire*, 705 F.3d at 572 (internal citation omitted). "The wider an audience for a strip search, the more humiliating it becomes, especially when the stripped individual is exposed to bystanders who do not share the searching officers' institutional need to view her unclothed." *Williams I*, 771 F.3d at 953. But, as noted above, "[a]n intrusive search is not necessarily an unreasonable one, especially in the corrections setting, where an inmate's interest in being free from privacy invasions must yield to the realities of operating a safe and effective corrections system." *Sumpter*, 868 F.3d at 483 (citation omitted); *see Price v. Johnston*, 334 U.S. 266, 285 (1948) ("Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.").

Here, the undisputed facts demonstrate that at the time of Williams's complaint, the City had in place a long-time policy of conducting group strip searches during the intake process. It appears, however, that groups of two or three detainees were only strip searched together in circumstances when large numbers of inmates were waiting to be processed. The "need" for this

particular aspect of the search procedure was, therefore, one of expediency. Large groups of inmates were often transported to the HOC at one time, as reflected in Williams's testimony.

Although it was possible to conduct individual searches, that would have caused significant delays in the intake process. This is no minor concern. As noted by this court in *Sumpter*, "Conducting individual searches in [busy, time-pressed] circumstances not only impeded the facility's interest in expeditiously processing incoming inmates, it compromised the health and safety of those inmates caught up in the delay." 868 F.3d at 484. It is undisputed that officers conducted strip searches of detainees not only to find contraband but to identify medical issues. It was in the best interest of the City and the detainees to treat such health problems as quickly as possible. *See id.* (outlining the health and safety implications of a delay in intake procedures at a facility similar to the one at issue).

Williams has not provided evidence questioning the legitimacy of the City's proffered justification. *See id.* Indeed, processing detainees in groups of two or three during high-volume hours would presumptively speed up the intake process. We find that the City's policy of allowing strip searches to be conducted in groups of two or three during busy periods, such as Williams's time of intake, was reasonably related to the City's legitimate penological interest of expediting the intake procedure. *See Stoudemire*, 705 F.3d at 572.

## B.     Delousing

Next, we must balance the intrusive nature of the City's prior delousing policy against its stated penological justification. As to the nature of the intrusion, there is no doubt that being sprayed with a liquid dispersed from a pressurized canister, while nude in front of a correctional officer and other inmates, is a serious intrusion of privacy. As we noted in *Williams I*, "courts have uniformly recognized that a search in which officers intentionally contact a naked detainee causes still deeper injury to personal dignity and individual privacy." 771 F.3d at 952 (citations omitted).

Viewing the facts in the light most favorable to Williams, as required when deciding the City's motion for summary judgment, we must also accept that she was ordered to "squat" during the delousing and that the solution "penetrated [her] anus." Like in *Sumpter*, however,

Williams has failed to submit evidence that the circumstances of her search—i.e., the solution's penetration of her anus—was not an isolated incident. 868 F.3d at 489. Indeed, she admittedly was unaware of whether everyone who underwent the intake process was asked to squat while being deloused, and Williams submitted no evidence demonstrating that the City customarily asked detainees to squat during the delousing process.

Thus, even accepting Williams's testimony as true, the City's official policy and customs are undisputed. Officers sprayed detainees from head to toe with a delousing solution while the detainees were nude and standing about one foot apart. Two to three detainees were sometimes deloused in the same room. The solution was administered through a pressurized dispenser from a distance of between six inches and four feet. The spray was a light mist and did not hit detainees with substantial force.

With regard to the City's justification for spraying detainees with the delousing solution in this manner, *Florence* observed that "[t]he danger of introducing lice or contagious infections . . . is well documented," 566 U.S. at 330-31 (citations omitted), and in *Williams I* this court observed "that a correctional facility's adoption of uniform delousing procedures is an acceptable prophylactic measure that may be administered even in the absence of individualized suspicion that any particular detainee is infected with lice." *Williams I*, 771 F.3d at 951 (citing *Florence*, 566 U.S. at 330-31). The City argues that it chose to spray the delousing solution on detainees rather than allow the detainees to self-apply the solution because they could not trust the inmates to follow instructions, and any failure to comply would potentially lead to community infestations. Although the City may not disregard "obvious, easy alternatives" if such alternatives accommodate inmates' rights "'at *de minimis* cost' to the institution's valid penological interest underlying the search in the first place," *id.* at 954 (citation omitted), it need not ignore reasonable risks posed by alternative policies.

We conclude that, based on the undisputed facts, the City's delousing policy did not violate Williams's Fourth Amendment rights. The City's decision to delouse detainees with a fine mist was reasonably related to its interest in maintaining the cleanliness and habitability of the HOC. *See Stoudemire*, 705 F.3d at 572. The need for delousing outweighed the admittedly substantial invasion of personal rights that resulted from the policy. The City has set forth "good

reasons" for its decision to delouse detainees at the HOC with a fine mist—and consequently, its delousing procedure was not "a needless intrusion into the detainees' constitutional rights." *See Williams I*, 771 F.3d at 955 ("In the final analysis, of course, the jail may have had good reasons for conducting these procedures in the particular manner in which it did. But that is a matter for resolution either at trial or on summary judgment, not on the pleadings." (internal citation omitted)).

Accordingly, we reverse the district court's partial grant of summary judgment in favor of Williams on her Fourth Amendment claim. We remand with instructions for the district court to grant summary judgment in favor of the City on all counts and to vacate the permanent injunction order.

**REVERSED and REMANDED**.

---

**CONCURRING IN PART AND DISSENTING IN PART**

---

HELENE N. WHITE, Circuit Judge (concurring in part, dissenting in part).  I agree with my colleagues that *Sumpter v. Wayne County*, 868 F.3d 473, 479, 490–91 (6th Cir. 2017), dictates that Williams's claims for declaratory and injunctive relief be dismissed.

I respectfully dissent from the reversal of the district court's rulings on count I of Williams's complaint asserting claims for monetary damages based on violations of the Fourth Amendment.  This court's repeated iterations of Supreme Court precedent are clear:  "[C]ourts must defer to the judgment of correctional officials unless the record contains substantial evidence showing their policies are an unnecessary or unjustified response to problems of jail security."  *Sumpter*, 868 F.3d at 481 (quoting *Florence v. Bd. of Chosen Freeholders of Burlington*, 566 U.S. 318, 322–23 (2012)).  In *Williams v. City of Cleveland*, 771 F.3d 945, 950 (6th Cir. 2014) (*Williams I*), we observed:

> [W]here a particular search or seizure involves significant intrusion into a detainee's privacy interests, the existence of "obvious, easy alternatives . . . that fully accommodate[] the prisoner's rights at *de minimis* cost to valid penological interests" suggests that the institution's need to proceed in its chosen manner does not outweigh the burdens it imposes upon the detainee and is therefore unreasonable.

*Williams I* (quoting *Turner v. Safley*, 482 U.S. 78, 90-91 (1987)).  Indeed, this is the law applied by this court to Williams's complaint in *Williams I*, and this is the law applied by the district court in deciding the case on remand.

After reviewing the evidence submitted by the parties, the district court found that Williams established through substantial evidence that there are obvious, easy alternatives to HOC's policy of strip-searching detainees in the presence of other female detainees and its mandatory "hose treatment" delousing policy, and that these alternatives can be accommodated at *de minimis* cost to HOC's asserted penological interests.  These findings are amply supported by the testimony, and the majority does not assert or support that they are clearly erroneous.  Further, the district court applied the correct legal analysis to these findings.

## A. Group Strip-Search Policy

In determining the constitutionality of HOC's group strip-search policy, the district court weighed HOC's penological interest in expediency against Williams's privacy interests and concluded that installing modesty panels or curtains would protect the latter at *de minimis* cost to the former:

> The justification put forward by Defendant for requiring detainees to disrobe in each other's presence is that the jail was "busy," and corrections officers need to strip search multiple detainees for expediency. However, Lt. Clark admitted that, while it may "slow things down just a little bit," detainees could easily be strip searched individually versus as part of a group. Evidence of the regulation's impropriety exists when "there are ready alternatives available to the regulations in question that fully accommodate the prisoner's rights at *de minimis* cost to valid penological interests," that go untapped. *Spies v. Voinovich*, 173 F.3d 398, 404 (6th Cir. 1999).
>
> The State of Ohio recommends the use of modesty panels. The Ohio Corrections Officer Basic Training Manual provides, in pertinent part:
>
>> 2. Based on several lawsuits on these kinds of cases, there are some general rules
>>
>>> c. Search area should provide privacy from outside observation
>>>
>>>> 1. Modesty panels are inexpensive and effective
>>>> 2. Use of these panels demonstrates good faith of a department to conduct searches in a constitutional manner.
>
> The City does not explain how the installation of modesty panels in the Clothing Room at the jail could not be accomplished should there be a legitimate need for strip searching multiple detainees.
>
> Upon examining the evidence, the Court finds that, under the particular circumstances at the [HOC], the corrections officers implementing the group strip searches did not strike a reasonable balance between Plaintiff's privacy interests and the need to provide safety and security at the jail. Therefore, the Court finds the visual strip search at the jail violated Plaintiffs' constitutional rights. Defendant can perform searches one at a time or in multiples with appropriate privacy partitions to allow detainees to remove their clothing without being viewed by other detainees, while still being observed by a corrections officer.

*Williams v. City of Cleveland*, 210 F. Supp. 3d 897, 907–08 (N.D. Ohio 2016); PID 2070-71/Dist. Ct. Op. Sept. 28, 2016 (internal citations omitted). As the district court noted,

Lieutenant Joseph Stottner, Jail Manager from 2007 to 2010 and now Supervisor, agreed at deposition that HOC could install privacy partitions [or modesty panels or curtains] that would permit corrections officers to view several individual detainees while being strip searched, while still allowing them privacy. *Id.* at 908 n.18; PID 2071 n.18 (citing PID 1334-37 (R. 107/Stottner Dep.) and PID 1660 (R. 111-32, photo of room where strip-searches occur, with Plaintiff's counsel's drawing of modesty panel or curtain superimposed)).

The district court's decision is therefore well supported and I would affirm.

**B. Pre-April 2010 Mandatory Delousing Policy**

Regarding the mandatory "hose treatment" delousing policy, which HOC suspended in April 2010, the district court took direction from our *Williams I* opinion where we explained:

> Because the focus must be on the jail's interest in carrying out the search and seizure in the particular manner that it chose, *see Florence*, 132 S. Ct. at 1516, the analysis in this case must balance the detainees' privacy rights against the jail's specific interest in spraying them with delousing agent from a pressurized canister while they crouched naked in the presence of other detainees instead of using less invasive procedures to achieve the same end.

*Williams I*, 771 F.3d at 952.

The district court took into account HOC's claim that delousing with the canister treatment, rather than letting the detainees self-apply the solution, was necessary because detainees follow directions only 50% of the time, as well as the testimony supporting that assertion. The district court assessed that justification in light of "the testimony of other corrections officials, who admitted that their instructions were nearly always followed by detainees in both the Shower Room and Clothing Room, even when they were using the 'hose method.'" 210 F. Supp. 3d at 905; PID 2065.

The district court also acknowledged the Middle District of Pennsylvania case cited by Defendants, *Logory v. County of Susquehanna*, 277 F.R.D. 135 (M.D. Penn. 2011), which rejected an asserted distinction between the self-application method involved in *Florence* and the canister method at issue here. The district court responded to that case by stating that this court in *Williams I* "determined that permitting self-application of a delousing solution like that which

was used in *Florence* 'could be readily implemented at the jail without compromising the jail's interest in preventing lice infestations.'" 210 F. Supp. 3d at 906 (quoting *Williams I*, 771 F.3d at 955); PID 2067. However, this court in fact stated that plaintiffs had "identified an alternative delousing regimen that is much less invasive than the 'hose treatment' and have plausibly alleged that it could be readily implemented at the jail without compromising the jail's interest in preventing lice infestations." *Williams I*, 771 F.3d at 955. It is unclear whether the district court thought this court had made a finding of fact, or whether it quoted this language in support of its rejection of the *Logory* case as relevant authority on the basis that this court had already rejected the notion that the difference between delousing by jail officials using a pressurized container and self-application by the detainees themselves is *de minimis*. The former proposition is incorrect; the latter sound. *Williams I* made no factual determinations; it did not determine that HOC could readily permit detainees to self-apply delousing solution without compromising its penological interest in preventing lice infestations. That is a factual determination left open by *Williams I*. However, *Williams I* clearly differentiated between the two methods, finding potential constitutional significance depending on the justification for the more invasive canister method.[1]

---

[1]As we observed in *Williams I*:

> [T]here is no question that permitting self-application of the delousing solution would be less humiliating and invasive than the "hose treatment." Not only would such a policy avoid officers' intentional physical touching of a detainee's intimate body parts, but it would also preserve a detainee's ability to exercise one of the most basic of human qualities: the faculty of choice. Giving a detainee the opportunity to self-apply the delousing agent permits her to weigh the alternatives and choose the option that enables her to comply with the delousing requirement while protecting her self-dignity. Simply spraying the detainee with a hose as if she was an object or an animal treats her as if she does not have the capacity to make that choice.
>
> . . . .
>
> Whether the particular manner in which the jail conducted the searches and seizures at issue here was "justified" depends on the facts, such as "whether any exigent circumstances compelled [the officers] to strip search [plaintiffs] in view of other inmates" or to disallow plaintiffs an opportunity to apply the delousing solution to themselves. *Stoudemire*, 705 F.3d at 573–74.

771 F.3d at 955.

At most, this ambiguity in the district court's reasoning would support a remand on this issue, not a reversal. Williams presented evidence that permitting detainees to self-apply a delousing solution was an alternative to the hose treatment that HOC could implement at *de minimis* cost to its penological interest in preventing lice outbreaks. In addition to the testimony that detainees nearly always follow directions, Lieutenant Flowers, HOC Jail Manager since September 2011, testified at deposition that the current system of sending detainees who have lice to the medical unit, which provides delousing solution to detainees for them to self-apply, works well and that no lice outbreaks have occurred:

> Q. And that's been working out fine for you at the house of corrections?
>
> A. Yes.
>
> Q. No major infestations?
>
> A. None.
>
> Q. They haven't had to like cord off like a whole housing unit and fumigate it or anything like that?
>
> A. No.
>
> Q. Have they had the problem with everyone in the housing unit getting it?
>
> A. No.
>
> Q. You would agree with me that the method that's being used now, it's a good method, isn't it, because it's working out?
>
> A. Yes, it's working.

PID 1162/Flowers Dep. In light of Lieutenant Flowers's testimony that the current delousing procedure is successful at preventing lice outbreaks, the majority's reversal of the district court on the basis of testimony that detainees cannot be trusted to self-apply delousing solution, Maj. Op. at 15–16, is questionable.

Given the conflicting testimony regarding alternatives to HOC's group strip-search policy and mandatory "hose treatment" delousing policy, the majority's determination that Cleveland is entitled to summary judgment is unjustified. At most, the matter should be remanded to the district court.